**DECLARATION IN SUPPORT OF CIVIL FORFEITURE COMPLAINT**

I, Brianna Anderson, after being duly sworn, depose and state as follows:

## I. BACKGROUND

1. I am a Special Agent with the United States Secret Service ("USSS") stationed in Dallas, Texas, and have been so employed since August 2021. I received criminal investigative training relevant to the subject areas addressed by the USSS at the Federal Law Enforcement Training Center in Glynco, Georgia. I have also received USSS training concerning criminal investigations of, among other things, counterfeit currency, bank fraud, money laundering, wire fraud, access device fraud, and identity theft. I am an investigative and law enforcement officer of the United States, in that I am empowered by law to execute warrants issued under the laws of the United States and to make arrests for felony offenses, under authority of 18 U.S.C. § 3056.

2. I am familiar with the information contained in this declaration, either through personal investigation or through discussion with other law enforcement officers and employees, who have participated in and have contributed documentary reports of their investigative efforts in this matter. This declaration is based on personal knowledge I have gained from the participation in this investigation, as well as information relayed to me from other sources. Because I submit this declaration for the limited purposes described below, I have not included each and every fact I know concerning this investigation.

## II. PREVIEW

1. The declaration describes how beginning on an unknown date, but no later than in or around August 2023, and continuing through in or around September 2024, SYED OSMAN, a.k.a. OSMAN SYED ("OSMAN"), acting through BIODX LABS LLC ("BIODX LABS"), along with other both known and unknown, did knowingly and willfully cause the submission of approximately $79 million in false and fraudulent claims to Medicare and Medicaid for laboratory testing that was not medically necessary, ineligible for reimbursement, and not provided as represented. As a result of these false and fraudulent claims, Medicare and Medicaid made payments to BIODX LABS in at least the approximate amount of $17 million.

2. The investigation into BIODX LABS is being conducted by the United States Secret Service (USSS), the United States Department of Health and Human Services, Office of Inspector General (HHS-OIG), the Department of Homeland Security Investigations (HSI), the Texas Attorney General's Medicaid Fraud Control Unit (MFCU), and the Federal Bureau of Investigation (FBI).

### III. FINANCIAL ASSETS SOUGHT FOR FORFEITURE

3. I submit this declaration in support of a complaint that seeks civil forfeiture of the following Defendant Property:

    a. $10,631,446.80 SEIZED PURSUANT TO WARRANT NO. 3:24-MJ-206-RB FROM BANK OF AMERICA ACCOUNT NUMBER 325146616583 IN THE NAME OF BIODX LABS LLC (**"Subject Bank Account 1"**); and

  b.  $5,003,120.98 SEIZED PURSUANT TO WARRANT NO. 3:24-MJ-204-RB FROM BANK OF AMERICA ACCOUNT NUMBER 325146616596 IN THE NAME OF BIODX LABS LLC ("**Subject Bank Account 2**").

## IV. LEGAL AUTHORITIES

4.  18 U.S.C § 1347 (health care fraud) prohibits persons from knowingly or willfully executing, or attempting to execute, a scheme to defraud any health care benefit program; or to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money of any health care benefit program.

5.  18 U.S.C. § 1343 (wire fraud) prohibits any person from devising any scheme or artifice to defraud, or for obtaining money by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire in interstate or foreign commerce.

6.  18 U.S.C. § 1349 (conspiracy to commit health care fraud) prohibits persons from attempting or conspiring to commit any other offense under Chapter 63, including health care fraud under 18 U.S.C. § 1347.

7.  18 U.S.C. § 1957 (engaging in transactions in criminally derived property) prohibits any person from knowingly engaging in a monetary transaction of a value greater than $10,000 involved in criminally derived property derived from a specified unlawful activity, and that the transaction took place in the United States.

8.  18 U.S.C. § 1956(h) (conspiracy to launder money) prohibits persons from attempting or conspiring to commit money laundering, including engaging in transactions in criminally derived property under 18 U.S.C. § 1957.

9.  For the purpose of this declaration, 18 U.S.C. §§ 1349, 1343, 1347 1956(h) and 1957, will collectively be referred to as the **Subject Offenses**.

10. Title 18 U.S.C. § 981(a)(1)(C) provides that any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from a violation of" "any offense constituting 'specified unlawful activity,' or a conspiracy to commit such offense" is subject to civil forfeiture to the United States.[1]

11. Title 18 U.S.C. § 981(a)(1)(A) provides that any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957 or any property traceable to such property is subject to civil forfeiture to the United States.

12. Title 28 U.S.C. § 1355 provides that a forfeiture action may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred.

13. Based on the legal authorities set forth above, and the facts and circumstances set forth below, I believe that the Defendant Property listed in paragraph 3 of this declaration is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), due

---

[1] Title 18, United States Code, Section 1347, is a "specified unlawful activity" pursuant to 18 U.S.C. § 1956(c)(7)(F).  Title 18, United States Code, Section 1343, is a "specified unlawful activity" pursuant to 18 U.S.C. § 1956(c)(7)(A).

**Declaration – Page 4**

to the Defendant Property being traceable to proceeds of wire fraud and health care fraud; and 18 U.S.C. § 981(a)(1)(A), because the Defendant Property is involved in money laundering.

## V. INVESTIGATIVE BACKGROUND AND EVIDENCE OF FRAUD

14. As discussed below, evidence gathered in the investigation demonstrates that beginning on an unknown date, but no later than in or around August 2023, and continuing through in or around September 2024, OSMAN, acting through BIODX LABS, caused the submission of approximately $79 million in claims to Medicare and Medicaid. From November 2023 through January 2024, **Subject Bank Account 1** received over $15.8 million in deposits from Medicare and Medicaid, approximately $5,170,000 of which was transferred via online transactions from **Subject Bank Account 1** to **Subject Bank Account 2**, all of which is fraudulent proceeds traceable to the commission of and/or involved in the **Subject Offenses.**

### Relevant Individuals and Entities

15. BIODX LABS (NPI 1366193088) is a business located at 670 N. MacArthur Blvd., Suite 160, Coppell, Texas 75019. BIODX LABS was incorporated with the Texas Secretary of State (TXSOS) on December 14, 2021, by registered agent and manager Adnan Malik ("Malik"). On October 1, 2023, a Certificate of Amendment was filed with the TXSOS, making OSMAN the new registered agent, manager, and owner (5% or more) for BIODX LABS and removing Malik.

16. BIODX LABS has been enrolled as a Medicare provider since February 23, 2022. According to Medicare records, Malik was the sole owner, authorized official, and managing employee of BIODX LABS until October 1, 2023. As of that date, through the present, OSMAN is the sole owner, authorized official, and managing employee of BIODX.

17. Physician 1 is a licensed family medicine physician residing in Richmond, Texas. From May 2023 to present, Physician 1 is listed as the referring provider on 100% of BIODX LAB'S claims to Medicare. Law enforcement officers interviewed Physician 1 on February 27, 2024. When asked if it was possible he ordered thousands of respiratory pathogen panel tests, Physician 1 expressed concern that his professional unique medical identifying information had been compromised. Further, Physician 1 stated he has no professional or financial relationship with BIODX LABS and/or its owner, OSMAN.

18. Malik opened **Subject Bank Account 1** and **Subject Bank Account 2** in or around December 2021. As of October 6, 2023, through the present, OSMAN became the sole signatory on both **Subject Bank Account 1** and **Subject Bank Account 2**.

### The Medicare Program

19. The Medicare program ("Medicare") was a federally funded health insurance program, affecting commerce, that provided benefits to individuals who were 65 years and older, and to certain disabled persons. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United

States Department of Health and Human Services ("HHS"). Medicare was a "health care benefit program" as defined in 18 U.S.C. § 24(b).

20.  Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Medicare beneficiaries were issued beneficiary identification cards that certified eligibility for Medicare and identified each beneficiary by a unique number.

21.  Physicians, clinical laboratories, and other health care providers that provided medical services to beneficiaries that were to be reimbursed by Medicare were referred to as Medicare "providers."

22.  Medicare was divided into different program "parts": Part A, Part B, Part C, and Part D. Medicare covered clinical laboratory services for those beneficiaries who were eligible for Medicare under Part B.  Medicare Part C, also known as the "Medicare Advantage" Program, provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed care plans, including health maintenance organizations and preferred provider organizations.  Medicare Advantage provided beneficiaries with all of the same services provided by an original fee-for-service Medicare plan, in addition to mandatory supplemental benefits and optional supplemental benefits.  To receive Medicare Advantage benefits, a beneficiary was required to enroll in a managed care plan operated by a private company approved by Medicare.  Among its responsibilities, these Medicare Advantage plans received, adjudicated and paid the

**Declaration – Page 7**

claims of authorized providers seeking reimbursements for the cost of health care benefits, items, or services supplied to Medicare Advantage beneficiaries.

23. Each Medicare beneficiary is identified with a unique beneficiary identification number. These beneficiary identification numbers are used to determine a beneficiary's eligibility for Medicare benefits and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services. HICNs and MBIs are two types of Medicare beneficiary identification numbers.

### Background on Medicare Enrollment

24. To participate in Medicare, providers, including clinical laboratories, are required to submit a Medicare enrollment application, which requires providers to certify that they will abide by Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and that they agree not to submit claims for payment to Medicare knowing they were false or fraudulent or with deliberate ignorance or reckless disregard of their truth or falsity.  If Medicare approved the application, Medicare assigned the provider an identifying number, which enabled the provider to submit claims to Medicare for reimbursement for services provided to Medicare beneficiaries.

25. In order to maintain active enrollment status, and as a condition of participation in Medicare, a clinical laboratory was required to report changes in enrollment information within 90 days. This included reporting any change of ownership or control interest.

**Declaration – Page 8**

26. A person with an "ownership or control interest" was defined, with respect to an entity, as a person with a direct or indirect ownership interest of 5 percent or more, or an officer or director of the entity. 42 U.S.C. § 1320a-3(a)(3)(A)(i), (B); 42 C.F.R. § 424.502. A managing employee was defined as a "general manager, business manager, administrator, director, or other individual that exercises operational or managerial control over, or who directly or indirectly conducts the day-to-day operations of the provider or supplier[.]" *Id*. § 1320a-5(b).

27. For certain types of providers, including clinical laboratories, the application to enroll in Medicare or make changes to enrollment was known as Form CMS-855B. Among other information, Form CMS-855B contained spaces for a provider to identify persons who have 5 percent or greater direct or indirect ownership interest, and all managing employees, including "a general manager, business manager, administrator, director, or other person who exercises operational or managerial control over, or who directly or indirectly conducts, the day-to-day operations . . . regardless of whether the individual is a W-2 employee of the supplier."

28. Further, the Form CMS-855B requires that an authorized official certify the contents of the application and attest that the company meets and will maintain certain requirements. In relevant part, the certification states that the official: (a) "agree[s] to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization"; (b) "understand[s] that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and

**Declaration – Page 9**

program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)"; and (c) "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

## Background on Laboratory Testing

29. Clinical laboratories performed various types of tests, such as toxicology screens, urinalysis, routine blood work, and tests for respiratory pathogens. These tests were performed on urine, blood, saliva samples and nasal swabs ("specimens"). Physicians, nurse practitioners, and other authorized providers could issue orders ("doctors' orders") for laboratory testing for Medicare beneficiaries and other patients.

30. Laboratories could perform tests to detect whether an individual had the novel coronavirus disease 2019, commonly referred to as COVID-19. Laboratories could also perform tests to detect a variety of viral and bacterial respiratory pathogens.

31. In general, the amounts Medicare reimbursed laboratories for respiratory pathogen testing was several times higher than the amount it reimbursed for solely COVID-19 testing.

## Background on Claims Submission

32. The Medicare claims form, Form CMS-1500, required providers to certify that the claim complied with applicable Medicare laws and regulations, including the Anti-Kickback Statute. When a CMS Form 1500 is submitted, the provider certifies that the contents of the form are true, correct, and complete, and that the form was prepared in

**Declaration – Page 10**

compliance with the laws and regulations governing Medicare. On the form, the Medicare provider certifies that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations." The form advises the provider that "anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws."

33. When submitting claims to Medicare, providers use HCPCS (Healthcare Common Procedure Coding System) codes. HCPCS codes are part of a uniform coding system used to identify, describe, and code medical, surgical, and diagnostic services performed by practicing physicians and other health care providers.

34. Medical providers indicate on their claims the HCPCS codes that correspond to the types of equipment or services for which Medicare is being charged. These codes are used to determine the reimbursement. The HCPCS codes relevant to this case are 87637 and 87913, among others. HCPCS code 87637 is defined as "Detection test by multiplex amplified probe technique for severe acute respiratory syndrome coronavirus 2 (SARS-COV-2) (Covid-19), influenza virus types A and B, and respiratory syncytial virus." HCPCS Code 87913 is defined as "Genotype analysis of severe acute

**Declaration – Page 11**

respiratory syndrome coronavirus 2 (Covid-19) by nucleic acid for identification of mutations in targeted regions."[2]

35. According to the Local Coverage Determination ("LCD"),[3] documentation supporting the claims for HCPCS codes 87637 and 87913 must include the "signature of the physician or non-physician practitioner responsible for and providing the care to the patient." Novitas Solutions, Inc., Article - Billing and Coding: Respiratory Pathogen Panel Testing (A58575) (2023).

## Background on Medicare Reimbursement

36. Novitas Solutions, Inc. ("Novitas") is the Medicare Administrative Contractor (MAC) for the state of Texas, among others. The MAC evaluates, adjudicates, and processes claims sent to Medicare. If claims are approved, funds are transferred directly to the provider's bank account listed in the Electronic Funds Transfer ("EFT") Authorization Agreement.

37. Novitas receives claim information for billing purposes at their office in Mechanicsburg, Pennsylvania.

38. Novitas uses U.S. Bank to make payments to providers in Texas. U.S. Bank's office for these payments is in St. Louis, Missouri.

---

[2] *See* https://www.aapc.com/codes/cpt-codes/87637, and https://www.aapc.com/codes/cpt-codes/87913.

[3] An LCD is a determination by a Medicare Administrative Contractor (MAC) whether to cover a particular service or item is reasonable and necessary, and therefore covered by Medicare within a specific jurisdiction that the MAC oversees.

**Declaration – Page 12**

39. Medicare pays for claims only if the items or services were medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, documented, and actually provided as represented. Medicare will not reimburse providers for items or services that were procured in violation of the Federal Anti-Kickback Statute or in violation of the provision prohibiting the purchase, sale, and distribution of Medicare beneficiary identification numbers.

### Medicare Documentation and Claims

40. On or about November 22, 2023, OSMAN caused the submission of the Form CMS-855B as the sole owner and operator of BIODX LABS, attesting he would abide by Medicare's rules and regulations.

41. BIODX LABS receives Medicare reimbursement via EFT. OSMAN, who is listed as the point of contact for BIODX LABS, authorized Medicare to deposit payments to BIODX LABS into **Subject Bank Account 1**.

42. Between November 16, 2023, and January 29, 2024, BIODX LABS submitted approximately 140,669 claims to Medicare for HCPCS codes 87637 and 87913. BIODX LABS billed $70,340,000 for those claims (approximately 99.9% of the total claims BIODX LABS submitted to Medicare).

43. BIODX LABS submitted more than approximately $1,417,000 in claims for over 1,090 Medicare beneficiaries who had passed away prior to the date of service listed in the claim. One of the beneficiaries had been deceased for over 35 years, and over 320 of the beneficiaries had been deceased prior to 2023, even though all of the

**Declaration – Page 13**

corresponding claims associated with those beneficiaries were for dates of service in 2023.

## Beneficiary Complaints

44. Between December 7, 2023, and February 13, 2024, the Medicare Benefit Integrity Unit ("BIU") received over 191 complaints related to BIODX LABS. The BIU is a program integrity unit that is responsible for preventing, detecting, and deterring Medicare fraud. One of the many functions of the BIU is to receive and catalog complaints that are received by the Medicare Fraud Hotline. These complaints are available for law enforcement to review. The complaints relating to BIODX LABS included the following, among others:

   a. 147 Medicare beneficiaries who did not receive services;

   b. 24 Medicare beneficiaries who do not know the provider; and

   c. 2 Medicare beneficiary who suspected that they were the victim of identity theft.

45. In addition to the fraud hotline where complaints against providers are routed to the BIU, HHS-OIG has another Medicare Fraud Hotline. When complaints are received there, they are routed directly to law enforcement. HHS-OIG received a hotline complaint regarding BIODX LABS on January 24, 2024. The complainant stated the following: "I do not know of Biodx Labs. Biodx [L]abs [b]illed $500 two times each to Medicare and to my supplement insurance co."

46. Agents have interviewed Medicare beneficiaries whose claims appeared in BIODX LAB'S data, all of whom were unfamiliar with BIODX LABS and Physician 1, the physician listed as the beneficiaries' referring provider.

47. The beneficiaries interviewed were unsure how BIODX LABS obtained their Medicare information, and four of them have already submitted requests for new Medicare numbers. All beneficiaries interviewed to date stated they believed these charges to be fictitious.

## Surveillance

48. On Tuesday December 12 and Tuesday December 19, 2023, an agent conducted surveillance at BIODX LABS (670 N. MacArthur Blvd., Suite 160, Coppell, Texas 75019). The doors were locked during business hours on both occasions.

## Claims Submission Information

49. On February 7, 2024, agents reviewed information provided by Claim.MD, the claims processor for BIODX LABS, as noted on its Medicare filings. According to the Claim.MD sessions log, which tracks the user who submits claims for a provider, OSMAN submitted all claims on behalf of BIODX LABS, utilizing the contact name "SYED OSMAN," email address "biodxlabs@gmail.com," and contact phone number "(972) 393-5227." On November 10, 2023, OSMAN signed a Business Associate Agreement on behalf of BioDX Labs, agreeing to do business with Claim.MD.

## OSMAN Location Information

50.     OSMAN is a citizen of India. OSMAN was issued a non-immigrant visa for temporary business relevant to his field of study and entered the U.S. on September 21, 2021. OSMAN's visa had an expiration date of July 12, 2024.

51.     SYED OSMAN's last known address was 10517 N. MacArthur Boulevard, Apartment 1031, Irving, TX 75063.

## Financial Accounts

52.     On or about December 23, 2021, **Subject Bank Account 1** was opened at Bank of America.  The signature card for the account is dated October 6, 2023, and lists OOSMAN, and OSMAN alone, as holding signature authorities on the account.

53.     On or about December 23, 2021, **Subject Bank Account 2** was opened at Bank of America.  The signature card for the account is dated October 6, 2023, and lists OSMAN, and OSMAN alone, as holding signature authorities on the account.

54.     On or about December 18, 2023, a withdrawal was made from **Subject Bank Account 2** in the form of a cashier's check made payable to Company 1 in the amount of $180,000.00. The cashier's check was deposited into Company 1 account number ending x33588 at Frost Bank.

55.     I reviewed the financial documents for Company 1 and confirmed the cashier's check was deposited into account ending x33588 at Frost Bank and subsequently sent overseas to businesses located in Korea and China via wire transfer.

56. Based on my training and experience, I believe Company 1's account to be acting in a potential money laundering capacity for various other businesses. Multiple other laboratories transferred funds to the Frost Bank account for Company 1 ending x33588, in approximately the same time frame as BIODX LAB'S transfer. Once the funds were received by Company 1, a large portion of the funds were wired to businesses in Turkey, China, Korea, and India.

57. Further, funds from the Frost Bank account for Company 1 ending x33588 that are not wired out overseas are instead paid via Zelle to a number of individuals, to include the owner of BIODX LABS, OSMAN.

58. On February 26, 2024, agents reviewed financial documents for BIODX LABS which showed that **Subject Bank Account 1** received approximately one hundred and four (104) deposits from Medicare and Medicaid, totaling approximately $15,839,208 between November 15, 2023, and January 31, 2024. These deposits, as well as the previously mentioned Medicare credits/deposits from Novitas, were the only deposits to **Subject Bank Account 1** during the aforementioned time frame.

59. Further, agents identified that transfers from **Subject Bank Account 1** were made while the Medicare and Medicaid deposits were being received into the account. Specifically, $170,000.00 was transferred via an online transaction from **Subject Bank Account 1** to **Subject Bank Account 2** on or about December 15, 2023, and $5,000,000 was transferred via an online transaction from **Subject Account 1** to **Subject Account 2** on or about December 19, 2023.

**Declaration – Page 17**

60. The aforementioned monetary transactions affected interstate and foreign commerce by, through, or to a financial institution, in criminally derived property of a value greater than $10,000, such transactions involving the proceeds of a specified unlawful activity, that is, health care fraud, in violation of 18 U.S.C. § 1347.

61. Based on similar facts and investigative findings, on March 1, 2024, agents seized (1) $10,631,646.80 from **Subject Bank Account 1**, pursuant to Warrant No. 3:24-MJ-204-RB, and (2) $5,003,120.98 from **Subject Bank Account 2**, pursuant to Warrant No. 3:24-MJ-206-RB, related to the **Subject Offenses.**

## VI. CONCLUSION

62. Based on the forgoing, OSMAN knowingly and willingly participated in a scheme to fraudulently obtain Medicare and Medicaid funds which were deposited in **Subject Bank Account 1** and further distributed into **Subject Bank Account 2.**

63. Specifically, OSMAN took actions to control BIODX LABS, submitted or caused to be submitted hundreds of thousands of false and fraudulent claims to Medicare and Medicaid for HCPCS codes 87637 and 87913 that totaled approximately $79 million. As a result, OSMAN committed violations of Subject Offenses.

64. The assets listed in paragraph 3 are also subject to civil forfeiture to the United Stated under Title 18 U.S.C. § 981(a)(1)(C).

65. The assets listed in paragraph 3 are also subject to civil forfeiture to the United Stated under Title 18 U.S.C. § 981(a)(1)(A).

66. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct.

Executed on December __23__, 2024.

*Brianna Anderson*

Brianna Anderson
Special Agent
United States Secret Service

**Declaration – Page 19**